Filed 4/16/13  In re K.F. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.F., a Person Coming Under the Juvenile Court Law. | B239738 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>K.C.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK85382;<br><br>San Bernardino County Super. Ct. No. J244112)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>**[CHANGE IN JUDGMENT]** |

THE COURT:

The opinion herein, filed on March 19, 2013, is modified as follows:

On page 12, the following line under the Disposition is to be deleted:  "…unless new circumstances would justify a finding of jurisdiction."  The following sentence is to be added between the second and third sentences of the Disposition:  "The Department may file a new section 300 petition if new circumstances would justify a finding of jurisdiction."  The Disposition should read as follows:  "The jurisdictional and dispositional orders are reversed as to K.F.  The court is ordered to dismiss the petition as to K.F.  The Department may file a new section 300 petition if new circumstances would

justify a finding of jurisdiction.  In that event, the court must ensure that the Department has complied by giving ICWA notice to the Choctaw tribe."

This modification effects a change in judgment.

Appellant's petition for rehearing is denied.

RUBIN, Acting P. J.   GRIMES, J.   FLIER, J.

Filed 3/19/13  In re K.F. CA2/8 (unmodifed version)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.F., a Person Coming Under the Juvenile Court Law. | B239738 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>K.C.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK85382;<br><br>San Bernardino County Super. Ct. No. J244112) **1** |

Appeal from the orders of the Superior Court of Los Angeles County.  Marguerite Downing, Judge.  Reversed and remanded with instructions.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

**1**     During the pendency of this appeal, the case was transferred to San Bernardino County.

Mother appeals from the jurisdictional findings under section 300, subdivision (a) of the Welfare and Institutions Code,[2] as well as the dispositional findings and orders under section 361, subdivision (c), for her now one and a half year old son, K.F. Father is not a party to this appeal. Mother contends the dependency court's finding that K.F. was at risk of nonaccidental abuse, and the court's order removing K.F. from her custody, are not supported by substantial evidence. She also contends that the dispositional order requiring her to undergo drug testing is an abuse of discretion. Lastly, mother contends, and respondent concedes, that notice under the Indian Child Welfare Act (ICWA) was insufficient because notice was not sent to one of the identified tribes. We find insufficient evidence to support the jurisdictional finding, in light of the sustained allegations in the petition, and thus we reverse. We will not reach the other grounds for the appeal because they are now moot, except to note that if new facts support jurisdiction, then ICWA compliance will be required.

## BACKGROUND

Mother was 18 years old when K.F. was born. As a child, mother had been the subject of many referrals to the Department of Children and Family Services. At the time of K.F.'s detention, mother and father had two sons, then one-year-old Ke.F. and two-month-old K.F. Mother was a minor when Ke.F. was born. In late 2010, before K.F.'s birth, a number of referrals concerning Ke.F. were made to the Department, resulting in his detention in December 2010, and a sustained petition on May 9, 2011, in a separate dependency proceeding which is not at issue in this appeal. We briefly describe that case here because the facts of that case provide the sole basis for jurisdiction over K.F. The sustained allegations in that separate proceeding were that: "On or about 05/11/2010, the child [Ke.F.'s] mother . . . and the child's father . . . were involved in a violent physical altercation, in which the father struck the mother's legs[,] with the father's fists causing bruising, resulting in law enforcement intervention. The mother required immediate medical treatment for the mother's injuries, resulting in the mother having to use crutches

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

to walk. Such violent conduct on the part of the parents endangers the child's physical and emotional health and safety, creates an unsafe home environment and places the child at risk of physical harm, damage, danger and physical abuse."

K.F. was born in September of 2011, after his older brother had been declared a dependent and removed from mother's custody. No petition was immediately filed as to K.F. However, the Department received a physical- and emotional-abuse referral concerning K.F. on November 2, 2011, after a fight between mother and paternal aunt.

## 1.    The Department's Investigation

Social worker Patricia Miskimins summarized her findings in the detention report. On November 2, 2011, Ms. Miskimins investigated a referral that K.F. was in danger because of a fight between mother and paternal aunt. She interviewed mother at her godmother's home. Mother had a stitched laceration on her left cheek and two stitched lacerations on her left forearm. She reported that paternal aunt was angry with mother and stabbed her. K.F. was with father in another room during the fight. When Ms. Miskimins asked to see K.F. to confirm that he was not hurt, mother told her, " 'I'm not gonna tell you [where he is] because you're just going to take my baby.' " She told Ms. Miskimins that K.F. was out of state in Las Vegas, and that " 'you already have one of my kids and you're not about to get another.' " Mother and Ms. Miskimins also discussed an incident, several months earlier, where mother was arrested for assaulting a co-tenant at a shelter for pregnant women in Las Vegas.

The next day, Ms. Miskimins spoke with mother's godmother, L.D. According to L.D., mother lived with maternal grandmother in Las Vegas after giving birth to K.F. Mother then came to Lancaster to stay with L.D. She stayed with L.D. for about two weeks, and then went to Mojave to stay with father's family. L.D. last saw K.F. on October 25, and he seemed fine.

Ms. Miskimins visited paternal grandmother's home in Mojave, and met with paternal grandmother and the paternal aunt with whom mother had fought. Paternal grandmother would not share her date of birth or telephone number, explaining that she would never be involved in K.F.'s life because mother's family would not permit it. She

3

also suffers from health problems, and was reluctant to discuss the case because it caused her stress.

According to paternal aunt, mother came home bleeding, claiming that some girl had beat her up. Later, when mother talked to police, she said paternal aunt was her attacker. Mother came to paternal grandmother's house on October 31 or November 1, with only one blanket for K.F. and no diapers or formula. Mother told paternal family members that someone had stolen K.F.'s clothes in Los Angeles. While staying with paternal grandmother, mother was out all day and came home high, apparently from cocaine. Paternal grandmother cared for K.F. while mother was gone. When mother was taken to the hospital to treat her wounds sustained in the fight with paternal aunt, K.F. stayed with paternal grandmother. Maternal grandmother called paternal grandmother and told her she was coming from Las Vegas to pick up K.F. Paternal aunt's sister met maternal grandmother at a gas station in Mojave on November 3 and gave her the baby to take back to Las Vegas.

Ms. Miskimins left messages for maternal grandmother, who returned her calls on November 3, stating that she was on her way to the Department so that Ms. Miskimins could see K.F. When maternal grandmother arrived, she explained that mother and K.F. were doing well in Las Vegas, but mother returned to California on October 1 to be closer to father and his family. Maternal grandmother had encouraged mother to stay at a shelter for pregnant women in Las Vegas, so she could access parenting courses to reunify with Ke.F. However, mother was attacked by her roommate at the shelter. Maternal grandmother denied any mental health or drug history with mother.

On November 4, Ms. Miskimins spoke with father. He heard that mother had been in a fight, but did not know the details. K.F. was with father at the time of the fight, at a different location. Father had not participated in reunification services for Ke.F.'s dependency case, and believed his parental rights had been terminated. He sees mother occasionally, but they are not in a relationship.

Ms. Wolford, the social worker assigned to Ke.F.'s case, attempted to contact mother so that K.F. could be assessed. Mother generally did not return her phone calls.

On October 19, Ms. Wolford received a call from maternal aunt, reporting that mother had left K.F. with her for several days and was not responding to her requests that she pick him up. Ms. Wolford also reported that mother's visits with Ke.F. had been inconsistent.

The sheriff's department incident report concerning the November 2 fight between mother and paternal aunt recounts that: "[Mother] said [paternal aunt] kept challenging her to a fight. [Mother] said that she was holding her 1 month old baby and [paternal aunt] kept asking her to put the baby down so they could fight. She said [paternal aunt] slapped the baby in the leg and said, 'Come on!' So [mother] put the baby down and they started fighting. [Mother] said that she never saw any type of knife or other cutting instrument. She said she noticed she was bleeding." Mother and paternal aunt also fought the night before the stabbing. When mother was taken to the hospital, K.F. was left with paternal aunt's sister at mother's request. Ultimately, the district attorney filed charges against paternal aunt for assault with a deadly weapon.

In a November 8, 2011 addendum report, social worker Sarah Wong expressed concern about whether mother was a "participant or victim in the violent altercation between the mother and the paternal aunt[.]" She acknowledged that further investigation was required, and that "[i]f appropriate, an amended petition will be filed."

Mother has an extensive child welfare history. She received three referrals for general neglect of Ke.F. Mother was herself the subject of 12 referrals when she was a minor, for abuse by maternal grandmother. Mother has a juvenile arrest for battery and an adjudication for battery against a peace officer.

The November 8 petition relating to K.F. included allegations that mother and father "have a history of engaging in violent altercations in the presence of the child's sibling, [Ke.F.]" (§ 300, subds. (a), (b); counts a-1 & b-2) and that mother "is a current abuser of illicit drugs including cocaine" (§ 300, subd. (b); count b-1). At the November 8 detention hearing, the trial court issued temporary detention orders, finding a sufficient prima facie showing that it was contrary to K.F.'s welfare to remain in mother's custody.

The court also ordered monitored visitation, and that mother submit to random drug testing.

Mother filed a Parental Notification of Indian Status, indicating possible "Cherokee, Blackfoot, [and] Chawktaw [*sic*]" ancestry. The court's minutes from the detention hearing reflect K.F.'s possible Indian heritage, specifying the "Cherokee, Blackfoot, and Choctaw tribes," and the trial court ordered the Department to send ICWA notices to these tribes and the Bureau of Indian Affairs. Notices were sent to the Cherokee and Blackfeet tribes, and the Bureau of Indian Affairs, but no notice was sent to the Choctaw tribe.

On November 18, the Department issued a jurisdiction and disposition report which included additional findings. Mother denied any drug history, and claimed that father's family members lied about drug use because paternal aunt was going to jail for " 'cutting [mother] up.' " According to mother, paternal grandmother was holding K.F. during the fight with paternal aunt, and father broke up the fight. As to the alleged domestic violence incident with father in 2010, mother said that it was just a verbal altercation. She had a scratch on her leg, and doctors wanted her to have an x-ray, but she could not have the test because she was pregnant. Mother and father are not in a relationship.

Regarding Ke.F.'s case, mother was ordered to participate in parent education and individual counseling to address anger management, domestic violence, and mental health issues. According to mother, she " 'did [her] parenting in Vegas.' " She did not have contact information for the facility where she completed her parenting courses, but said that her attorney had the paperwork. The social worker located the Living Grace Home facility where mother had resided for a short time in Las Vegas, and confirmed that mother had completed four out of six parenting classes there. Mother also participated in some counseling, but had not completed her counseling or domestic violence course. She was not drug testing because she was staying in Los Angeles and the testing facility was in Lancaster.

6

Father denied being present for the fight between mother and paternal aunt, and claimed that K.F. was with him when the fight happened.

At the time of the May 11, 2010 domestic violence incident with father, mother was six-months pregnant with Ke.F. She and father had been living together for one month. Father grabbed his sister's neck during an argument, and mother told him it was wrong to choke his sister. Father became enraged and told mother, " 'Shut up you're not my girl, don't tell me sh--!' " Father starting hitting mother with both fists. She was scared he would hit her stomach, so she blocked his blows with her legs. Other family members pulled father off of her. Father left the home, and mother called maternal grandmother to pick her up. The next morning, mother could not stand without assistance. She went to the hospital and was given crutches. Law enforcement personnel saw bruising on her right leg.

At the team decision making meeting regarding Ke.F., it was revealed that mother had a history of running away with the baby. She was defiant and failed to follow house rules of the family members she stayed with, including maternal grandmother.

Maternal grandmother reported that mother often got into fights in high school. Maternal grandmother was concerned about mother's mental health and believed she was either bipolar or suffered from depression.

Mother's drug test results from a December 30, 2011 on-demand drug test were negative. But mother was a "no show" for random tests on January 4, 2012, January 25, and February 1.

On February 2, 2012, mother reported that she started domestic violence counseling on January 10, 2012, with "Rodger Davis." She did not have a telephone number or the name of the program.

A letter dated February 6, 2012, from Roger Davis, Executive Director of Narconon Fresh Start Outreach Center, indicated that mother attended anger management and domestic violence classes between January 10, 2012, and February 6, 2012, Monday through Friday, from 10 a.m. to 4 p.m. daily. According to Mr. Davis, mother "has all

7

the necessary tools that she needs to handle any or all situations[,] she has now completed the program."

## 2. The Adjudication Hearing

At the February 23, 2012 contested hearing on the petition, the trial court received the Department's reports and their attachments into evidence. Mother objected to hearsay statements by paternal grandmother and paternal aunt in the social workers' reports. The court allowed the statements into evidence under section 355, but indicated that the statements would not be the sole basis for jurisdiction. The court also found that ICWA was inapplicable.

Mother presented no evidence but argued that there was insufficient evidence of a current risk to K.F. based on the single past incident of domestic violence between her and father. Mother also argued there was no substantial evidence that she was using drugs or alcohol.

The Department acknowledged there was only one incident of domestic violence, but contended that "what is really at issue is that mom has a serious anger management issue."

After considering the evidence, the trial court sustained only the following allegation:

> "[a-1 under section 300, subdivision (a)] The child, [K.F.'s] mother . . . and father . . . have a history of engaging in violent altercations in the presence of the child's sibling, [Ke.F.]. The father struck the mother's legs with father's fists, causing the mother to walk with crutches and inflicting bruising to the mother's legs. The mother failed to regularly participate in [court-ordered] domestic violence counseling and parenting. The child's sibling, [Ke.F.], is a current dependent of the Juvenile Court due to the parents' violent altercations. The parents' history of violent altercations endangers the child's physical health and safety and places the child at risk of physical harm, damage and danger."

The trial court also found by clear and convincing evidence that there was a substantial danger to K.F. unless he was removed from mother's custody. The court

8

ordered mother to undergo 10 random drug tests, and to participate in a drug program if she failed any tests.

This timely appeal followed.

## DISCUSSION

Mother makes four contentions on appeal: (1) there is no substantial evidence that K.F. was at risk of harm because of the May 2010 domestic violence incident which occurred before he was born; (2) there was no substantial evidence in support of the trial court's removal order; (3) the trial court abused its discretion when it ordered drug testing; and (4) the ICWA notice was inadequate because the Choctaw tribe did not receive notice as ordered by the court. Also, to the extent the Department relied on mother's asserted "long history of violence" to support jurisdiction, mother contends that jurisdiction cannot be based on conduct that was not alleged in the petition. Because we find that jurisdiction under section 300, subdivision (a), as alleged in the petition, was not supported by substantial evidence, we need not reach the other issues raised by mother's appeal, except to note that in the event new facts would support jurisdiction, ICWA notice must be given to the Choctaw tribe.

## 1. Jurisdiction

Mother contends the findings under section 300, subdivision (a) are unsupported. Under section 300, subdivision (a), the juvenile court may adjudge a child to be a dependent of the court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." Exposure to domestic violence may satisfy subdivision (a), if it creates a substantial risk that the child will suffer "serious physical harm inflicted nonaccidentally by the parent." (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598-600 [father placed child at substantial risk of serious physical injury by driving with one hand on the steering wheel and using the other to hit and choke mother, struggling with mother over the car seat while the child was in it, and physically attacking mother while she was holding the child].)

9

"In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding. [Citation.] . . . [Citation.] The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 915-916.)

The sustained petition found that the violent history between mother and father put K.F. at risk. It is undisputed that the only evidence of a violent history between mother and father is the May 11, 2010 incident on which Ke.F.'s dependency is based. Mother contends that a single incident of domestic violence between mother and father, committed more than a year before K.F. was born and nearly one and a half years before the filing of the instant petition, does not support jurisdiction over K.F. We agree.

While some courts have found that past conduct, alone, is sufficient to support a jurisdictional finding, these cases are inapposite because K.F. was not yet born at the time of the May 11, 2010 domestic violence incident, and the rationale behind an assertion of jurisdiction for past conduct is that the child already suffered some form of abuse. (See *In re J.K.* (2009) 174 Cal.App.4th 1426, 1434-1435 [subds. (a), (b), and (d) of § 300 "are satisfied by a showing that the minor *has suffered prior* serious physical harm or abuse"]; see also *In re David H.* (2008) 165 Cal.App.4th 1626, 1644.) Because K.F. has never suffered abuse based on the "history of violent altercations" between mother and father, the domestic violence between mother and father could support jurisdiction only if it were ongoing and created a substantial likelihood of placing K.F. at risk of nonaccidental harm in the future. (See *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717; *In re Giovanni F.*, *supra*, 184 Cal.App.4th at p. 600.) Here, mother and father are no longer in a relationship, and there was no evidence of any continuing conflicts between them. (*In re Daisy H.*, at p. 717.)

10

Although the sustained petition also alleged that "mother failed to regularly participate in Juvenile Court ordered domestic violence counseling and parenting," that finding was not supported by the record, because the social workers' reports demonstrated that mother had made progress with her parenting courses, and had participated in domestic violence and anger management classes.

The Department contends that jurisdiction is supported by mother's propensity towards violence, including battery arrests and an adjudication when she was a minor, a fight at the shelter for pregnant women in Las Vegas, and the altercation with paternal aunt. Mother may have anger management issues, and jurisdiction on that basis may be warranted, but no such facts were alleged in the petition, and we cannot affirm a jurisdictional finding that was never alleged. (*In re J.O.* (2009) 178 Cal.App.4th 139, 152-153, fn. 13 [the juvenile court may not rely on unalleged conduct to support a jurisdictional finding]; see also *In re B. G.* (1974) 11 Cal.3d 679, 688-689; *In re Stacy T.* (1997) 52 Cal.App.4th 1415, 1424.)

The petition alleged domestic violence between mother and father in the presence of Ke.F., and not a history of violent conduct by mother.[3] The trial court or the Department could have amended the petition to include such allegations, but did not do so. (See § 348; *In re Jessica C.*, *supra*, 93 Cal.App.4th at p. 1041.) It appears the Department "bootstrapped" this case to Ke.F.'s dependency, when it received a referral because of the fight between mother and paternal aunt.

Because the Department did not meet its burden of proving the section 300, subdivision (a) allegation, we reverse the jurisdictional order. Mother's challenges to the dispositional orders and all subsequent orders are moot. However, if proceedings are

---

[3] We do not hold that a parent may challenge the assertion of jurisdiction based on immaterial deviations between the allegations in the petition and the proof on which the true finding is based. (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1037.) We merely conclude, under the facts of this case, that the sustained allegations were not supported by substantial evidence, and that the proof on which the Department relied was unrelated to the concerns raised in the petition, and could not support a true finding as to those allegations. (See *In re Alysha S.* (1996) 51 Cal.App.4th 393, 399-400.)

11

reinstituted, we note that the notice under ICWA was inadequate. ICWA allows an Indian tribe to intervene in dependency proceedings to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . ." (25 U.S.C. § 1902.) ICWA contains specific notice requirements that apply when the juvenile court knows or has reason to know that an Indian child is involved. (25 U.S.C. § 1912, subd. (a).) The juvenile court " 'needs only a suggestion of Indian ancestry to trigger the notice requirement.' " (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703.) Here, mother notified the court that she may have Cherokee, Blackfeet, and Choctaw heritage. The court ordered notice to all of these tribes, however, no notice was given to the Choctaw tribe.

## DISPOSITION

The jurisdictional and dispositional orders are reversed as to K.F. The court is ordered to dismiss the petition as to K.F., unless new circumstances would justify a finding of jurisdiction. In that event, the court must ensure that the Department has complied by giving ICWA notice to the Choctaw tribe.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

GRIMES, J.

WE CONCUR:

RUBIN, Acting P. J.

FLIER, J.

12